Jose L. ELIZONDO and Guillermina Elizondo, Appellants/Cross–Appellees,

v.

Ronald KRIST, The Krist Law Firm, P.C., Kevin D. Krist and William T. Wells, Appellees/Cross–Appellants.

No. 14–09–00267–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 14, 2010.

Rehearing Overruled April 21, 2011.

Michael Jude Lowenberg, Kenneth R. Breitbeil, Donald B. McFall, Brian K. Tully, Houston, for appellants.

Steve McConnico, Jane M.N. Webre, Ryan Squires, Austin, Warren W. Harris, William Fred Hagans, Jennifer B. Rustay,

John Wesley Raley, Houston, Diana L. Faust, Dallas, for appellees.

Panel consists of Justices FROST, BROWN, and CHRISTOPHER.

## MAJORITY OPINION

JEFFREY V. BROWN, Justice.

Appellants and cross-appellees Jose L. Elizondo and his wife, Guillermina Elizondo, appeal the trial court's orders granting summary judgment in favor of appellees and cross-appellants Ronald D. Krist, The Krist Law Firm, P.C., Kevin D. Krist, and William T. Wells (collectively, "the Lawyers"). In six issues, the Elizondos contend the trial court erred in granting the Lawyers' motions for summary judgment and abused its discretion in striking portions of the affidavit of the Elizondos' lawyer expert. In a cross-issue, the Lawyers argue the trial court erred in denying their motions for summary judgment on the nonexistence of an attorney-client relationship with Mrs. Elizondo. We affirm.

### I

Jose Elizondo was working at the BP Amoco Chemical Company plant in Texas City when an explosion occurred in March 2005. The blast threw him about twenty feet. Jose received medical attention for neck and back injuries, and returned to work several days later. He continued to be affected by emotional problems, however, as several of his close co-workers were killed.

Shortly after the explosion, Jose met with attorney William Wells. Wells had been recommended by Jose's supervisor at BP. During the meeting with Wells, Jose signed a power of attorney, retaining Wells to represent him in all claims against BP arising out of the explosion. Guillermina Elizondo was not at the meeting and did not sign the power of attorney.

Wells subsequently sent a demand letter to BP asking for a settlement of $2 million for the Elizondos' claims. BP responded by offering $50,000. Wells then decided to enlist Ronald Krist, Kevin Krist, and the Krist Law Firm as additional counsel in the hope that they could negotiate a larger settlement. Wells referred several cases arising out of the explosion, including Jose's, to the Krist Law Firm. Ronald and Kevin Krist arranged to meet with counsel for BP to discuss the cases and try to settle them. After the meeting, however, BP's settlement offer to Jose was still $50,000.

Wells and Kevin Krist met with Jose to discuss BP's settlement offer and his options. Ultimately, Jose decided to accept BP's offer, and signed a release and settlement agreement. Although the release was drafted to include Guillermina and included a separate, printed space for her signature, she never signed the release because one of the attorneys at the settlement meeting told Jose that it was not necessary. After he signed the agreement, Jose never contacted any of the Lawyers again.

In August 2007, Jose learned that an attorney named "Krist" who had handled claims for some of the explosion victims was now working for BP. He consulted an attorney and, that same month, filed an action against the Lawyers. In an amended petition, Jose and Guillermina asserted claims for professional negligence, breach of fiduciary duty, violations of the Texas Deceptive Trade Practices Act ("DTPA"), common-law fraud, fraudulent misrepresentations, negligent representations, and fraudulent inducement. They also sought recovery of actual and exemplary damages. Jose and Guillermina alleged, among other things, that the Lawyers failed to obtain a larger settlement for

Jose and never discussed pursuing or settling a loss-of-consortium claim—which was now time-barred—on Guillermina's behalf. They also alleged that Jose was "sold down the river" so that Ronald Krist could represent BP in connection with the underlying claims of the Elizondos and others.

The Lawyers filed various motions for summary judgment asserting, among other things, no evidence of damages, impermissible fracturing or "claim splitting" of a legal malpractice claim into claims for breach of fiduciary duty, fraud, negligent misrepresentation and DTPA violations, no attorney-client relationship with Guillermina, and termination of the attorney-client relationship with Jose upon his execution of a release. The Lawyers also argued that fee-forfeiture damages could not be recovered as a matter of law. The trial court granted some of the Lawyers' summary judgment motions and denied others. Based on all of the summary-judgment rulings, the trial court rendered a final, take-nothing judgment against the Elizondos on all of their claims. This appeal followed.

## II

In their first and second issues, the Elizondos contend the trial court erred by dismissing Jose's and Guillermina's claims on the ground that they presented no evidence of damages. In their sixth issue, they contend the trial court abused its discretion in striking portions of the affidavit of their expert, attorney Arturo Gonzalez. Because the Elizondos offered attorney Gonzalez's affidavit as some evidence of their alleged damages, we will begin with the trial court's ruling on the Lawyers' objections to Gonzalez's affidavit.

## A

In their no-evidence motions for summary judgment, the Lawyers argued that all of the Elizondos' claims should be dismissed because they have no evidence of damages. Specifically, the Lawyers argued that the Elizondos had no evidence that BP was willing to pay anything more than what Jose Elizondo agreed to accept and the Elizondos could not identify anyone who obtained a larger settlement. In response, the Elizondos offered their own deposition testimony and Gonzalez's affidavit.

In his affidavit, Gonzalez averred that, based on his experience working on the BP docket at two plaintiffs' law firms, he had personal knowledge of the values of cases these firms settled on behalf of their clients, and he had personally participated in the settlement and mediation process for many cases. Gonzalez's nine-page affidavit described in detail his background as a licensed attorney, his experience in BP litigation, the confidentiality of the settlements with BP, the criteria considered in the settlement process, and the specifics of the Elizondo case, including his opinions on the Lawyers' liability and damages.

The trial court struck the following portions of Gonzalez's affidavit:

- **General Value of Elizondo Case**

  Based on the factual information provided and reviewed by me, my experience in the BP litigation, my knowledge of general settlement values and in the criteria and protocol relied upon to establish general settlement values in the BP litigation, it is my opinion that for a plaintiffs' attorney acting within the standard of care applicable to the same or similar circumstances, using reasonable due diligence, the Elizondo case would have had a general value, by way of settlement or verdict, in the range of between Two Million ($2,000,000.00) and Three Million ($3,000,000.00) dollars. Guillermina Elizondo's individual claim

would represent some part of that value, but Jose's claim would represent the majority of that value. The settlement value of the Elizondo claim is not distinguished as compensatory, non-economic or exemplary in nature, but instead is a single value offered by BP so that BP could avoid a trial or jury verdict.

- In my opinion, ... the Lawyers would have garnered far in excess of the $50,000 offer which was supposedly the most that BP would ever pay.

- [T]hese cases were heavily evaluated and settlements obtained were significantly higher as compared to the average personal injury lawsuit in the state of Texas.

The Elizondos contend that the trial court abused its discretion in striking these portions of Gonzalez's affidavit, and that the exclusion of this testimony probably caused the rendition of an improper judgment. They argue that if Gonzalez's testimony had been allowed, it would have established that their claims would have had a value of between $2 and $3 million. But the Elizondos do not challenge any specific evidentiary grounds for the trial court's ruling. Instead, they merely assert that Gonzalez's qualifications were unchallenged and he has "personal knowledge and extensive experience in settling a portion of the 4000 claims arising out of the BP explosion, all of which BP settled before a jury could return a verdict." [1]

The decision whether to admit or exclude evidence is committed to the sound discretion of the trial court. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). A trial court's evidentiary ruling must be upheld if there is a legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). Even if the exclusion of evidence is found to be an abuse of discretion, it does not warrant reversal unless the error probably caused the rendition of an improper judgment. *Id.*

The Lawyers assert that Gonzalez's testimony is conclusory, self-serving, based on hearsay, devoid of analysis, speculative, and otherwise incompetent. They also complain that Gonzalez sought to testify about the settlement value of the Elizondos' underlying claims based on facts he is precluded from disclosing or discussing due to the confidential nature of the information concerning other BP settlements.

In his affidavit, Gonzalez states that the settlement process and settlement amounts are confidential and therefore he is "precluded pursuant to the confidentiality provisions from divulging specific settlement amounts related to the monetary payments by BP to specific plaintiffs." [2] And although Gonzalez lists specific crite-

---

1. By not challenging the evidentiary basis for the trial court's rulings or the Lawyers' objections, the Elizondos have arguably waived any error in those rulings. Regardless of this deficiency, we will address the merits of the trial court's rulings.

2. The Elizondos sought to obtain discovery regarding various documents relating to the BP settlements and, in response, the Lawyers asserted various objections. The Elizondos also asked for a court order under which Gonzalez could reveal specific information regarding the BP settlements, and the Lawyers opposed this motion. But, the Elizondos have not asserted on appeal that the trial court sustained the Lawyers' discovery objections or denied this motion, and the Elizondos have not cited any place in the record in which the trial court made any ruling in this regard. In addition, the Elizondos have not assigned error or presented argument challenging any such ruling by the trial court.

ria he contends BP "focused on" when determining settlement values, he offers no analysis to explain how these factors would be applied to the Elizondos' situation. He also fails to link settlement amounts to specific injuries and circumstances, and provides no comparison of settlement amounts of similar claims. Thus, Gonzalez's affidavit offers only conclusory and speculative opinions.

■ Conclusory statements by an expert witness are insufficient to raise a question of fact to defeat summary judgment. *McIntyre v. Ramirez*, 109 S.W.3d 741, 749 (Tex.2003). An expert must provide a reasoned basis for his opinion. *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999). *Burrow* involved a legal-malpractice action that arose out of the representation of plaintiffs in a class action lawsuit that ended in settlement. The expert for the defendant lawyers averred that he had reviewed all the relevant facts and concluded that the plaintiffs' settlements were fair and reasonable. *Id.* at 235–36. The Supreme Court of Texas held the expert's affidavit was insufficient because he did not state the basis for his opinion. *Id.* The court described the expert's testimony as "Take my word for it, I know: the settlements were fair and reasonable." *Id.* at 236. We conclude that Gonzalez's affidavit is similarly insufficient.

Accordingly, the trial court did not abuse its discretion in excluding those portions of Gonzalez's affidavit. We therefore overrule the Elizondos' sixth issue.

## B

In their first and second issues, the Elizondos contend that, even if portions of Gonzalez's affidavit were properly stricken, they presented competent evidence of their damages through their deposition testimony and the non-stricken portions of Gonzalez's affidavit.

## 1

■ To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim. Tex.R. Civ. P. 166a(i); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002). The trial court must grant the motion unless the respondent produces summary-judgment evidence raising a genuine issue of material fact. Tex.R. Civ. P. 166a(i). However, the respondent is "not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements." *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

■ When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex.2005). We sustain a no-evidence summary judgment if (1) there is a complete absence of proof of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *See id.* at 810. Less than a scintilla of evidence exists when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, and in legal effect is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions as to the existence of the vital fact. *Id.*

2

Here, Jose contends that he should have received a larger settlement than he got, and Guillermina contends that she obtained no settlement because her consortium claim was not pursued. But the trial court struck those parts of the Elizondos' attorney-expert's affidavit concerning the value of their cases "by way of settlement or verdict," and the record contains no other objective evidence of the value of either Jose's or Guillermina's case.

Concerning Jose, summary judgment was proper on all of his claims because there is no evidence that he would have received more from BP than the $50,000 he received in settlement. In his deposition, Jose could not identify anyone who obtained a larger settlement for similar claims, the amount of any other settlement received, or whether the settlements were for injuries like those he suffered. Jose also admitted he had no idea what the value of his claim is. On appeal, Jose focuses on the harm that he suffered from the explosion, but this evidence is no evidence of damage from the Lawyers' alleged negligence in prosecuting his claim. Guillermina likewise testified that she did not know the value of Jose's claims, and she did not know of anyone who received a larger settlement for the same type of claim. Jose's and Guillermina's testimony presented no legally sufficient evidence of the value of Jose's claim.

Guillermina's testimony concerning her loss-of-consortium claim is likewise no evidence of damage from the Lawyers' alleged wrongdoing. Loss of spousal consortium is an independent cause of action derivative of the injured person's claim. *See Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 328 (Tex.1993) (defining spousal consortium as the mutual right of the husband and wife to that affection, solace, comfort, companionship, society, assistance, and sexual relations necessary to a successful marriage). On appeal, Guillermina points to her testimony concerning the changes in her relationship with Jose after the explosion, but, like Jose's testimony concerning his injuries from the explosion, this testimony is not evidence of the recovery she would have received if her claim had been prosecuted without malpractice. Guillermina admitted she did not know what the value of her own claim is, and she did not know of any spouse who recovered any greater amount from BP. Jose also admitted he had no idea what the value of his wife's claim is. The Elizondos have presented no evidence of the value of Guillermina's claim.

Further, the non-stricken portions of attorney Gonzalez's affidavit do not otherwise provide evidence of the Elizondos' damages. The Elizondos point to Gonzalez's statements that a diligent attorney would have prosecuted Jose's claims further if the pre-litigation settlement offer was not in the range of $2 to $3 million, and that Jose's case "had value substantially in excess of BP's 'best offer.'" Gonzales also stated that the settlement received was "inadequate," "very inadequate," not "fair and reasonable," and "basically for nuisance value." The trial court struck (1) a paragraph assigning a general dollar value of $2 to $3 million to his case, (2) a sentence stating that Jose could have gotten more than $50,000, and (3) a statement that settlements in BP cases were higher than most personal-injury lawsuits in Texas. Because the foundation for Gonzalez's non-stricken statements about adequacy of the settlement was excluded, the remaining statements the Elizondos rely on are conclusory, speculative, and unsupported by any underlying facts. *See 1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 27 (Tex.App.-

Houston [14th Dist.] 2005, pet. denied.) (conclusory statements are those that do not provide underlying facts to support conclusion). Unsupported, conclusory opinions of a witness do not constitute evidence of probative force and will not support a jury finding. *See, e.g., City of San Antonio v. Pollock,* 284 S.W.3d 809, 816 (Tex.2009); *Gen. Motors Corp. v. Iracheta,* 161 S.W.3d 462, 471 (Tex.2005). Such opinions are simply not evidence. *See Iracheta,* 161 S.W.3d at 471. Without his stricken testimony as a factual basis, therefore, Gonzalez's other statements do not raise a genuine fact issue as to damages.

Because the Elizondos have not presented more than a scintilla of competent evidence of their damages arising from the Lawyers' allegedly wrongful conduct, the trial court did not err in granting summary judgment on this ground. We therefore overrule the Elizondos' first and second issues. Because we have determined that the trial court did not err in granting summary judgment on the Elizondos' claim based on no evidence of damages, we need not reach the Elizondos' third issue, that the trial court erred in granting summary judgment regarding the termination of Jose's representation, or their fourth issue, that the trial court erred in granting summary judgment on their claims other than malpractice.

### C

■ In their fifth issue, the Elizondos contend that the trial court erred in granting summary judgment on fee forfeiture as another form of relief—other than damages—for their claims. *See Burrow,* 997 S.W.2d at 240 (holding that a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client). Specifically, they argue that the trial court erred in granting summary judgment on the grounds that fee forfeiture should not be applied to disgorge fees that BP paid to Ronald Krist and The Krist Law Firm for work performed for BP in conflict with the lawyers' ongoing representation of Jose and Guillermina.

It is undisputed that the Elizondos paid no fees to the Lawyers and so the Lawyers have no fees from them to disgorge. Instead, the Elizondos argue, the Lawyers should be required to disgorge fees they were paid by BP, a third party. In support of this contention, the Elizondos cite the eminent jurist Judge Learned Hand, who wrote that if an attorney represents opposing interests:

> The usual consequence has been that he is debarred from receiving any fee from either, no matter how successful his labors. Nor will the court hear him urge, or let him prove, that in fact the conflict of his loyalties has had no influence upon his conduct; the prohibition is absolute and the consequence is a forfeiture of all pay.

*Silbiger v. Prudence Bonds Corp.,* 180 F.2d 917, 920–21 (2d Cir.1950) (citations omitted). Initially, we observe that a requirement that a lawyer who represents conflicting interests must disgorge "all pay" does not necessarily lead to the conclusion that one client may be awarded the fees paid by the other client. Another interpretation of the quoted language is that the attorney must disgorge to each client the fees that each client paid to the lawyer. Further, we note that an automatic forfeiture of "all pay," without regard to the value of any services rendered to the client, conflicts with *Burrow v. Arce,* in which our supreme court instructs that fee forfeiture is available only for "clear and serious" violations of a lawyer's duty, and even then total fee forfeiture may not

always be appropriate. *See Burrow*, 997 S.W.2d at 241–42.

Further, courts that have considered this specific issue have concluded that plaintiffs should not be allowed to recover fees paid by a third party. *See Swank v. Cunningham*, 258 S.W.3d 647, 673–74 (Tex.App.-Eastland 2008, pet. denied) (holding parties were not entitled to fees paid to law firm by third parties, even in related matters); *Liberty Mut. Ins. Co. v. Gardere & Wynne, L.L.P.*, 82 Fed.Appx. 116, 121 (5th Cir.2003) (holding that forfeiture of other client's fees paid to attorneys, even in related matters, is an improper extension of *Burrow v. Arce* ).

We conclude that the Elizondos are not entitled to the remedy of forfeiture of fees BP paid to the lawyers, and therefore the trial court did not err in granting summary judgment in favor of Ronald Krist

and the Krist Law Firm. We overrule the Elizondos' fifth issue.

\*    \*    \*

We overrule the Elizondos' first, second, fifth, and six issues, and do not reach the third and fourth issues. Accordingly, we affirm the trial court's judgment.

CHRISTOPHER, J., concurring and dissenting.

TRACY CHRISTOPHER, Justice, concurring and dissenting.

I agree with the majority on the fifth issue concerning fee forfeiture. But because I believe the Elizondos presented some evidence of damages in response to the no-evidence motion for summary judgment on damages, I respectfully dissent. The Elizondos have made the following factual allegations:

| | |
|---|---|
| March 28, 2005: | Jose signed a power of attorney with Wells. |
| August, 31, 2005: | Wells sent a $2,000,000 demand letter to BP on behalf of both Jose and Guillermina. |
| December 9, 2005: | BP offered $50,000 to settle the Elizondos' case. |
| December 21, 2005: | Wells associated Kevin Krist, Ronald Krist and the Krist Law Firm as additional counsel for Wells's four BP cases. |
| January 31, 2006: | Ronald and Kevin Krist met with BP to settle Wells's cases. |
| February 22, 2006: | Jose signed a release and settlement with BP for $50,000. The release included a signature page for Guillermina but she never signed the release. The settlement included a provision that BP would settle Jose's worker's compensation lien. |
| November 2006: | Ronald Krist and the Krist Law Firm began representing BP in connection with the incident. |
| March 23, 2007: | The statute of limitations ran on Guillermina's claim. |
| June 13, 2008: | BP sent the Krist Law Firm notice that Jose's worker's compensation lien was paid. |

The Lawyers contest that they ever repre- sented Guillermina [1] and contend that their

---

1. The trial judge denied a motion for summary judgment on this point. The appellees have asserted this as a cross-point on appeal.

representation of Jose ended when he signed the release February 22, 2006.[2]

## A. The trial court abused his discretion in striking Gonzalez's affidavit.

The Elizondos sued the Lawyers, asserting numerous causes of action including legal malpractice and breach of fiduciary duty. Citing *Burrow v. Arce*, 997 S.W.2d 229 (Tex.1999), the majority concludes that the affidavit of Gonzalez was too conclusory to be evidence of damages at all. In *Burrow*, the Supreme Court concluded that the affidavit of attorney Malinak was insufficient to support the lawyers' burden of proof in an affirmative motion for summary judgment. After concluding that the affidavit was conclusory, the court noted ways in which the affidavit could have presented a sufficient basis for the opinion, stating, "Malinak might have analyzed the Clients' injuries by type, or related settlement amounts to medical reports and expenses, or compared these settlements to those of similar claims, or provided other information showing a relationship between the plaintiffs' circumstances and the amounts received. He did not do so." *Id.* at 236. In my opinion, Gonzalez's affidavit is not similarly deficient and presented the information needed to support his opinion on the value of the Elizondos' claims. A conclusory statement is one that does not provide the underlying facts to support the conclusion. *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex.App.-Houston [1st Dist.] 1997, no writ). Gonzalez's affidavit provided the underlying facts to support his opinion and therefore was not conclusory. *See Hou–Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Thus, I would hold that the trial court abused its discretion in striking portions of the affidavit. *See Allbritton v. Gillespie, Rozen,*

*Tanner & Watsky, P.C.,* 180 S.W.3d 889, 894 (Tex.App.-Dallas 2005, pet. denied).

Gonzalez provided the following information in his affidavit:

- Gonzalez worked for both the Ammons Law Firm and Brent Coon & Associates on their BP dockets.
- Ammons had approximately 125 BP cases and Brent Coon had over 400 claimants.
- Gonzalez was appointed by the 212th District Court as Plaintiffs' liaison counsel for the BP litigation.
- At both law firms, a confidential spreadsheet was used to track each case, including settlement demands and offers.
- Gonzalez was "intimately involved on a day to day basis with the settlement process."
- He participated in settlement conferences with Bill Noble with BP and their lawyer, David Salyer.
- During the September 2007 BP trial, Gonzalez was ordered to meet with Nobel and Salyer in the judge's chambers to attempt to settle as many cases as possible.
- Gonzalez participated in mediation of the BP cases, mediating ten cases a day.

Gonzalez also testified that BP and the lawyers focused on certain criteria for the purpose of determining the value of a case. The factors were:

- The victim's proximity to ground zero;
- The length of time between the injury and the report of the injury to a supervisor;
- Corroboration of the victim's alleged proximity to ground zero and the time

---

2. The trial judge granted a motion for summary judgment in favor of the Lawyers on this point. The appellants have also appealed this ruling.

the injury was reported to a supervisor or to management;

- The victim's age;
- The victim's past and future wage-earning capacity and wage loss;
- The injuries alleged, including the nature, extent, duration, and biomechanics of the injuries;
- The medical treatment received, including the need for surgical intervention;
- Whether the victim was single or married, i.e., whether there were associated claims for loss of consortium; and
- Onsite vs. offsite claims.

Gonzalez then testified that he reviewed the following specific information concerning Jose's claim:

- On or about March 23, 2005, Jose was in the employ of Altair Strickland, a subcontractor providing services at the BP Texas City facility. At that time, he was 37 years old.
- Jose had just left the Altair Strickland trailer and was in the street between the 180M and the Ultracracker units and was heading toward the Ultracracker unit when the explosion took place. This location is approximately 200 to 300 feet from the blowdown stack. The force of the explosion blew him a number of feet into a port-a-potty.
- Jose was near Mr. Eamello at the time of the blast.
- Jose sustained injuries to his neck and lower back and suffered such mental anguish and emotional distress that he was considered to have post-traumatic stress disorder.
- He was first treated for his neck and back injuries by Dr. Ron Kirkwood and Dr. English of Kirkwood Medical Associates on March 26, 2005.

- Jose saw Dr. David Winberly at Fondren Orthopedic on April 1, 2005, for complaints of neck and lower back pain, and had a follow-up visit on June 7, 2005 for persistent neck and back pain.
- He received physical therapy at TIRR twelve times over the six-week period between April 7 and May 19, 2005.
- Jose was first treated for mental anguish or emotional distress by Dr. Susana Rosin on May 6, 2005. He attended additional therapy sessions on May 20, July 6, and August 3, 2005. His treatment lasted approximately three months.
- Jose is married to Guillermina Elizondo, and they had four children at the time of the explosion. They currently have five children.
- On March 23, 2005, Jose earned about $23 per hour and worked approximately 50 to 60 hours each week.
- Jose missed work as a result of the March 23, 2005 events.
- He has not been physically or medically restricted from working, but he was injured in the explosion.

Gonzalez noted that when a husband is injured in a workplace accident, his wife has an independent claim for loss of consortium. Gonzalez had handled spousal claims involving similar injuries. He believed that the general value of Jose and Guillermina's claims by way of settlement or verdict was in the range of two to three million dollars, and some part of this total value would be attributable to Guillermina's individual claim.

Unlike the affidavit in *Burrow,* Gonzalez's affidavit provided the criteria used to evaluate the claims and the specific facts of the Elizondos' claims to support his opinion. The only information missing from his affidavit was the names of the other

plaintiffs whose settlements formed the basis of Gonzalez's comparison, but because all of the BP settlements were confidential, Gonzalez could not reveal the amount paid to settle the claims of a specific plaintiff.

## B.   The Lawyers refused to produce information about other settlements.

During the course of discovery, the Elizondos tried to obtain settlement information about other plaintiffs. Through written discovery, they first sought the settlement information for the other three cases that the Lawyers handled. The Lawyers objected that the information was irrelevant and privileged.[3] The Elizondos next requested any settlement matrix or grid that was prepared by BP and given to the Lawyers while they were representing the Elizondos, and the Lawyers raised the same objections. The Elizondos tried to obtain the information through depositions of third parties, including other BP attorneys, but the Lawyers objected to these depositions as well. The Elizondos asked for a court order to allow Gonzalez[4] to reveal specifics from the BP settlements, and the Lawyers opposed the order.

During Wells's deposition, his attorney refused to allow him to answer any question about the settlements of the other cases that Wells handled. During Ronald Krist's deposition, his lawyer objected on the basis of privilege to any information about the amount paid to settle any of the BP cases or BP's ranking system for settlement that was disclosed to other plaintiffs or their counsel.

It would be fundamentally unfair for the Lawyers to thwart discovery as to other settlements and at the same time use the lack of that information to strike Gonzalez's affidavit. *Cf. Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 107–08 (Tex. 1985); *Westheimer v. Tennant*, 831 S.W.2d 880, 884 (Tex.App.-Houston [14th Dist.] 1992, no writ) (a party seeking affirmative relief cannot assert privilege to prevent the adverse party from obtaining evidence in its defense; the claimant must choose between asserting its claim or asserting privilege, but cannot do both). The BP release included a confidentiality provision but allowed for disclosure pursuant to court order. The Lawyers could have joined the Elizondos in their request for such a court order but they did not.

Moreover, the rationale for excluding Gonzalez's opinion—i.e., that an attorney who does not reveal the confidential amounts paid to specifically-identified plaintiffs cannot express an opinion as to whether another plaintiff received a fair settlement of his claims arising from the same event—applies equally to the defendant Lawyers. Under this reasoning, all of the defendant Lawyers in this case are similarly barred from expressing an opinion as to whether Jose received a fair settlement.

## C.   The non-stricken portions of the affidavit provide some evidence of damages.

Even if the trial court did not abuse its discretion in excluding some portions of Gonzalez's affidavit, the remaining statements in the affidavit provide some evi-

---

3.  The amount that BP paid to another client is not privileged information because a third party—BP—knows the amount. Similarly, a settlement grid prepared by a third party is not privileged.

4.  Gonzalez was willing to provide the settlement information if he had the protection of a court order. The BP settlements were confidential but subject to disclosure under court order.

dence of damages. Gonzalez opined that the case "had value substantially in excess of BP's best offer." He described the settlement as "inadequate," "very inadequate," not "fair and reasonable" and "basically for nuisance value." The foundation as outlined above supports his opinions and provides some evidence of damages.

### D. Guillermina's testimony provides some evidence of damages.

The no-evidence motion for summary judgment on damages did not address causation; it only addressed the existence of damages. Thus, Guillermina was not required to prove through expert testimony that the Lawyers breached the standard of care, that the breach was a proximate cause of damages and that the damages are collectible. She was not required to prove what BP would have settled her case for because that implicates causation. In a claim for loss of consortium, there is no need for expert testimony on the issue of damages; testimony that the primary victim's injuries interfere with family activities is sufficient. *See Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 328 (Tex.1993) (testimony that, as a result of wife's injuries, couple no longer engages in their former outdoor activities and that travel has become difficult is "at least some evidence" of loss-of-consortium damages). A jury can evaluate the plaintiff's own testimony and determine whether or not the claim had a monetary value. Guillermina's testimony provides some evidence of damages for loss of consortium that a jury could evaluate.

On this record, I would conclude that the Elizondos presented some evidence of damages, and thus, the judgment cannot be affirmed on this basis. I therefore would address the remaining points of error and cross-points not reached by the majority.